F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JAN 03 2018   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

POWER UP LENDING GROUP, LTD.           :

              Plaintiff,           :

      -against-           :

RCGR SUB, INC. , A DELAWARE           :
CORPORATION F/K/A INTERCONTINENTAL  :
TECHNOLOGY, INC., A COLORADO           :
CORPORATION, F/K/A RICH CIGARS, INC.,   :
A FLORIDA CORPORATION, RICHARD DAVIS,:
DROR SVORAI, AND FIRST           :
INTERCONTINENTAL TECHNOLOGY, INC. ,  :
A DELAWARE CORPORATION F/K/A           :
INTERCONTINENTAL TECHNOLOGY, INC.,   :

             Defendants.           :

---------------------------------------------------------------x

Civil Action No.:

CV- 18 0031

HURLEY, J.

LINDSAY, M.J.

## COMPLAINT

Plaintiff, POWER UP LENDING GROUP, LTD. ("Plaintiff"), files this Complaint and alleges the following:

### I. SUMMARY

1.    Plaintiff  brings this action for equitable relief and damages caused by violations of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder, as well as breaches of contract and tortious misconduct by Richard Davis ("Davis"), Dror Svorai ("Svorai"), and RCGR Sub, Inc. f/k/a Intercontinental Technology, Inc., f/k/a Rich Cigars Inc. ("the Corporate Defendant"),  and First Intercontinental Technology, Inc. f/k/a Intercontinental Technology, Inc. (collectively, jointly and severally, with Davis and Svorai, "the Defendants"). Through this action, Plaintiff seeks to recover losses caused by the Defendants' intentional and/or reckless misconduct, including compensatory

and/or rescissory damages, which losses may only be avoided if the equitable relief and injunctive relief described herein below is granted.

2.      That at all relevant times, Davis was and remains the President and a director of the Corporate Defendant and Svorai was and remains an officer and director on information and belief.  That in addition, and upon information and belief, Svorai, commencing in November 2017 and all relevant times thereafter has been and remains the principal shareholder of the Corporate Defendant, owning a majority of the stock thereof, giving him total and unfettered control of the actions of the Corporate Defendant, which he manipulates and controls through Davis and others, who act at his behest. Thus, upon information and belief, the actions undertaken by the Defendants that are complained of herein, were performed at the instruction and direction of Svorai, in derogation of Plaintiff 's rights.  Davis and Svorai  are herein referred to from time to time as "the Individual Defendants".

3.      That Plaintiff was an investor in the Corporate Defendant and was well-known to the Defendants.  Plaintiff's business strategy at the time of the stock purchases and loans and issuance of notes at issue was to invest in publicly-traded, nano-cap companies whose securities are traded on the Over the Counter Bulletin Board, OTCQB and the "Pink Sheets." Nano-cap companies, such as the Corporate Defendant, are often capital-constrained, as their low market capitalization hinders their access to banks or investment firms.  Plaintiff   provides capital to such companies, as an investment in return for shares purchased at a discount to market price.

4.      That Plaintiff invested $66,000.00 in the Corporate Defendant by purchasing securities directly from the Corporate Defendant and making loans thereto, and has sustained damages in excess of $1,000,000, exclusive of attorney's fees, pre judgment interest and costs.

2

## II.        JURISDICTION AND VENUE

5.        This action arises under the anti-fraud provisions of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b)), and Securities and Exchange Commission Rule 10b-5 (17 C.F.R. §240.10b-5). The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Jurisdiction is also invoked pursuant to 28 U.S.C. §1332, upon the grounds that there is complete diversity between the parties and more than $75,000 is at issue.  Defendants, directly and indirectly, singly or in concert, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, or of the mails in connection with the acts, practices and courses of conduct alleged in this Complaint, certain of which occurred within the Eastern District of New York.

6.        Venue is proper in this court pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), because certain of the transactions, acts, practices, and courses of conduct constituting violations of duties established by the Federal Securities Laws occurred within this judicial district.  Additionally, Plaintiff transacts business and maintains its principal place of business in this district. Furthermore, the Corporate Defendant contractually consented to and agreed to venue and jurisdiction in the state courts of New York or in the federal courts located in the state and county of Nassau which is within the Eastern District.  The Individual Defendants are also subject to this contractual provision governing venue and jurisdiction pursuant to applicable law. The other corporate defendant, First Intercontinental Technology, Inc. f/k/a Intercontinental Technology, Inc. has been and remains a Delaware corporation and a citizen of the State of Delaware, and is the de facto successor in interest to the Corporate Defendant and is therefore bound by the contractual venue and jurisdiction and venue provisions.

7.     That in connection with the acts alleged in this Complaint, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

8.     That at all times relevant herein, Plaintiff has been and remains a corporation organized and existing under the laws of the State of Virginia with an office for business in the County of Nassau, not engaged in the banking business.   That at the time of the commencement of this action, the Plaintiff was a citizen of the State of Virginia.

9.     That at the time the contractual agreements at issue were entered into the Corporate Defendant was known as Rich Cigars Inc., a Florida corporation with an office for business in Tampa, Florida.   That on December 15, 2017 Rich Cigars Inc. was redomiciled in the State of Colorado, changed its name to Intercontinental Technology Inc. and yet retained the identical Securities and Exchange Commission file number and Internal Revenue Service Employer Identification Number.   That on December 26, 2017 Intercontinental Technology Inc. was redomiciled once again from Colorado to Delaware and was renamed RCGR Sub, Inc. Thus, the Corporate Defendant at the time of the commencement of this action was a citizen of the State of Delaware with an office for business in Tampa, Florida.

10.     That at all times relevant herein, defendant Davis has been and remains a resident of the State of Florida, City of Tampa, and Svorai has been and remains a resident of the State of Florida, City of Miami.   Thus, the Individual Defendants at the time of the commencement of this action were citizens of the State of Florida.   Defendant First Intercontinental Technology, Inc. f/k/a Intercontinental Technology, Inc. has been and remains a citizen of the State of

4

Delaware with an office for business in Tampa, Florida which is the same office maintained by the Corporate Defendant.

## IV.     FACTUAL ALLEGATIONS

11.     That heretofore and from time to time, the Defendants acting in concert and with malevolence and in bad faith, have undertaken steps to cause the Plaintiff's contractual rights to be rendered worthless, such that the defendants have engaged in a conspiracy to engage in conduct that constitutes a prima facie tort, fraud, and intentional interference with contract, which have cause the Plaintiff to sustain damages of at least $1,000,000.

12.     That as a result of the defendants' intentional wrongdoing, the Plaintiff's investment in the Corporate Defendant has been lost and the Plaintiff has been deprived of the opportunity of receiving at least $1,000,000 in lost profits.

AS AND FOR A FIRST CAUSE OF ACTION
CONVERTIBLE PROMISSORY NOTES DEFAULTS

13.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 12 of this Complaint with the same force and effect as if fully set forth at length herein.

14.     That on or about May 30, 2017, the Corporate Defendant, as borrower, made, executed and delivered to Plaintiff a convertible promissory note ("the May Note") in the amount of $38,000.00, which Note was issued pursuant to a Securities Purchase Agreement ("the May Agreement") of even date, which provided for certain issuance of, and conversion rights in and to the common stock of the Corporate Defendant. These rights of conversion were a fundamental and irreplaceable part of the transaction without which the Plaintiff would never have advanced $38,000 to the Corporate Defendant.

15.     That on or about September 27, 2017, the Corporate Defendant, as borrower, made, executed and delivered to Plaintiff a convertible promissory note ("the September Note")

in the amount of $28,000, which Note was issued pursuant to a Securities Purchase Agreement ("the September Agreement") of even date, which provided for certain issuance of, and conversion rights in and to the common stock of the Corporate Defendant. Once again, these conversion rights were an integral and material part of the transaction without which the Plaintiff never would have entered into the transaction in the first instance.

16.     That in the Notes, the Corporate Defendant: (i) granted Plaintiff the right to convert all or any part of the outstanding and unpaid principal amount and accrued interest of the Note into fully paid and non-assessable shares of common stock of the Corporate Defendant; and (ii) agreed that an Event of Default of the Note shall occur upon the failure of the Corporate Defendant to timely issue shares of common stock of the Corporate Defendant to Plaintiff upon receipt of a conversion notice delivered pursuant to the Note.

17.     That on or about December 4, 2017, Plaintiff made, executed and delivered to the Corporate Defendant a conversion notice ("Conversion Notice") in accordance with the May Note with respect to the conversion of $1,870.00 of the May Note's principal balance into 129,861 shares of common stock of the Corporate Defendant, hereinafter referred to as the "Conversion Shares". That conversion was successfully completed. That on or about December 6, 2017, an additional conversion of $1,875.00 of the principal of said May Note was successfully converted into 132,208 shares of the Corporate Defendant. That on December 12, 2017, an additional $1,870.00 of debt was converted into 129,861 shares, and on December 18, 2017, an additional $2,340.00 was successfully converted into 156,000 shares. That these four conversions reduced the principal balance by like amounts, leaving a pre-default balance of principal in the amount of $30,045.00.

18.     That on December 22, 2017, Plaintiff issued an additional conversion notice for $2,340.00 of principal under the May Note which was convertible into 156,000 shares of the

Corporate Defendant. Pursuant to the Note and the Securities Agreement, the Corporate Defendant was required to issue and deliver within three days of the Conversion Notice, said shares of the common stock of the Corporate Defendant to Plaintiff. However, the Corporate Defendant failed to do so and defaulted due to the fact that in violation of the Notes and Agreements, the transfer agent holding the shares required for conversion received a letter from an attorney representing the Corporate Defendant, to wit, Randall Goulding, Esq., directing the transfer agent to refuse the conversion request. The transfer agent obeyed those instructions which were essentially issued by the Corporate Defendant and as a result the Corporate Defendant willfully defaulted under the May Note and Agreement. This was a fundamental breach of the Corporate Defendant's obligations under the Notes and Agreements. That stated otherwise, under the Notes and Agreements, it is the contractual obligation of the Corporate Defendant to cause such shares as are necessary to permit conversion to be issued and held in reserve for the protection of Plaintiff so that such reserve shares would be issued outstanding and available as and when Plaintiff wishes to commence the conversion process. That due to a sudden increase in the price and value of the Corporate Defendant's stock, the Corporate Defendant and those acting in concert with it made a deliberate decision to wantonly breach the Note and Agreement thus defaulting thereunder.

19. That in addition, the Notes provide that the sale, conveyance or disposition of the assets of the Corporate Defendant or the consolidation, merger or other business combination of the Corporate Defendant with any other person or entity shall also be an event of default pursuant to which the Corporate Defendant shall be required to pay to the Plaintiff a Default Amount as specified and defined therein. Further, the Note provides that in the event of any proposed merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event as a result of which the shares of common stock of the Corporate Defendant shall

be changed into the same or different shares of stock of the Corporate Defendant or another entity, then in that event, the Plaintiff would be entitled to receive, in lieu of the common stock that would normally be issuable upon conversion such stock which the Plaintiff would have been entitled to receive had the Note been converted in full, immediately prior to such transaction. IN addition, the Corporate Defendant contractually agreed that it would not enter into such a transaction without giving the Plaintiff at least ten days written notice of the same and that during the ten-day period the Plaintiff would be entitled to convert the Note in full.

20.     That in December 2017 as noted above, the Corporate Defendant became involved and part of a series of mergers or similar corporate events without providing any notice to the Plaintiff or taking steps to ensure that the Plaintiff would receive the corporate stock or other securities that it was entitled to under the Note.  The facts and circumstances of these corporate events which constituted a violation of the Note were described in a letter of Plaintiff's counsel dated December 27, 2017, a copy of which is annexed hereto and incorporated herein as though set forth in length.

21.     That the Individual Defendants, Davis and Svorai, together with Goulding expressly failed to direct the Corporate Defendant to provide the notice referred to above and prevented the Corporate Defendant from providing the shares of stock to which the Plaintiff was contractually entitled  for the sole purpose and intention of creating a scenario where the Plaintiff would be fraudulently deprived of its conversion rights under the Notes and Agreements thereby causing severe prejudice and irreparable harm to the Plaintiff out of malevolent disinterest as these actions did not benefit the Corporate Defendant but were instead designed to cause harm to the Plaintiff for the sake of harm itself.  This represents a deliberate effort to manipulate the price of the stock on the open market in violation of the Federal Securities Laws.

22.     That the Notes contain a provision known as and referred to as a "cross default" provision that expressly provides that a breach or default by the Corporate Defendant of any covenant or other term or condition contained in any Note due to Plaintiff shall be considered a default under all Notes due to Plaintiff.

23.     That by virtue of the foregoing, the Corporate Defendant is in default under the May Note and is also in default under the September Note, and no such defaults have been cured.

24.     That as a result of these uncured defaults, Plaintiff's counsel served a Notice of Default on January 2, 2018, a copy of which is annexed hereto and incorporated herein as if set forth at length.

25.     That the Corporate Defendant and the Individual Defendants have not cured the defaults with respect to the failure to deliver the Conversion Shares thereby causing damages to Plaintiff in an amount to be determined by the Court but not less than an amount equal to the existing and remaining principal balance under the Notes, which is calculated as $30,045.00 for the May Note, and $28,000.00 for the September Note, for a total principal of $58,045.00, which principal amount is increased by 200% default provision contained in the Notes and Agreements such that the unpaid principal is $116,090.00 together with applicable interest thereon.

26.     That Section 1.4(g) of the Notes provides that the Corporate Defendant shall pay to Plaintiff $2,000 per day, in cash, for each day that the Corporate Defendant fails to deliver the Conversion Shares to Plaintiff following the third (3rd) business day after receipt of the Conversion Notice by Plaintiff, also as liquidated damages and not as a penalty.

27.     That moreover, pursuant to Section 1.4(g) of the Notes, Corporate Defendant acknowledged that the liquidated damages provision contained in Section 1.4(g) are justified as damages resulting from a failure, attempt to frustrate, interference with the conversion rights are difficult if not impossible to quantify.

28.     That the Corporate Defendant and the actions of the Individual Defendants have caused damages to Plaintiff in an amount to be determined by the Court but not less than an amount equal to $116,090.00 together with applicable interest thereon.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT – LOST PROFITS

29.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 28 of this Complaint with the same force and effect as if fully set forth at length herein.

30.     That as a direct result of the defaults of the Defendants and their failure to abide by their contractual obligations, Plaintiff has been deprived of, and continues to be deprived of, the opportunity to acquire and to sell the common stock of the Corporate Defendant at a profit, which profits have been irretrievably lost as the markets for the common stock can no longer be recreated.

31.     That in particular in December 2017 the Corporate Defendant became a part of a trend in which a substantial number of publicly traded companies became swept up in the "bitcoin" craze as a result of which, there stock mushroomed in value.

32.     That as to the Corporate Defendant, its stock multiplied in value to the point where had the Plaintiff been allowed to convert debt into stock as required by the contractual instruments at issue, the Plaintiff would have received a profit of at least $400,000 on the May Note as well as an expected profit of at least $600,000 on the September Note for a total profit of at least $1,000,000.

33.     That the very purpose and fundamental intention of the Notes and Agreements is that the Plaintiff will be permitted to receive stock of the Corporate Defendant at a pre-set discount and to then make a profit by reselling the stock based on the then current value of the stock.

34.     That the defendants in this case, acting with malice and purposeful intention deliberately took the steps outlined in this complaint in order to prevent the plaintiff from capitalizing on the mushrooming value of the stock as caused by the bitcoin craze.

35.     That by reason of the foregoing, the plaintiff demands and is entitled to judgment in the amount of its lost profits to be determined by the Court but in no event less than $1,000,000.

36.     That by reason of the foregoing, Plaintiff is entitled to judgment in an amount to be determined by the Court and equal to the lost profits that Plaintiff would have realized had the stock been made available and delivered to Plaintiff in accordance with its Conversion Notice.

## AS AND FOR A THIRD CAUSE OF ACTION
## BREACH OF CONTRACT – LITIGATION EXPENSES

37.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth at length herein.

38.     That the Agreements provide that in the event of a dispute and/or litigation between the parties, the prevailing parties shall be entitled to recover all of its litigation expenses including reasonable attorney fees.

39.     That by reason of the foregoing, Plaintiff is entitled to a judgment against Defendants for the reasonable legal fees and litigation expenses paid or incurred in this action.

## AS AND FOR A FOURTH CAUSE OF ACTION FRAUD:
## VIOLATIONS OF SECTION 10(b) of the EXCHANGE ACT
## [15U.S.C. §78j(b) and Rule 10(b)-5b THEREUNDER [17 C.F.R.§240.10b-5 (b)]

40.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 39 of this Complaint with the same force and effect as if fully set forth at length herein.

41.     That through the foregoing conduct, the Corporate Defendant, together with and acting in concert with the Individual Defendants, knowingly and recklessly engaged in manipulation and deceptive conduct in connection with a securities transaction in violation of 15U.S.C. §78j(b) and the Rules and regulations promulgated thereunder, by failing to disclose and misrepresenting the true nature of their intentions as set forth above.

42.     That the Defendants further engaged in knowing manipulation and deceptive conduct by directly representing and warranting that the Corporate Defendant and the Individual Defendants would honor its obligations pursuant to the Notes, Agreements and Guarantee when in truth and in fact had no intention to do so.

43.     That in reliance on the foregoing misrepresentations and material omissions by the Defendants, Plaintiff was induced to purchase the Corporate Defendant's securities and to make loans to the Corporate Defendant as aforesaid.

44.     That as a direct and proximate result of the Defendant's conduct, Plaintiff suffered damages, in an amount to be determined by the Court, for not less than $116,090.00.

### AS AND FOR A FIFTH CAUSE OF ACTION – THE INTENTIONAL INTERFERENCE WITH PLAINTIFF'S CONTRACTUAL RIGHTS

45.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 of this Complaint with the same force and effect as if fully set forth at length herein.

46.     That the Individual Defendants, with knowledge of the contractual obligations of the Corporate Defendant, intentionally and unjustifiably interfered with the business relationship between Plaintiff and the Corporate Defendant by causing the Corporate Defendant to deliberately and without justification refuse to permit the conversion process to be completed as described above, and to deliver the stock to Plaintiff as aforesaid.

47.     That as a direct and proximate result of the foregoing, the Individual Defendants intentionally interfered with the contracts between Plaintiff and the Corporate Defendant,

causing the Corporate Defendant to breach those contracts in tortuous contravention of the rights of Plaintiff.

48.   That by virtue of the foregoing, Plaintiff is entitled to judgment against the Individual Defendants in an amount to be determined by the Court but no less than $1,000,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
## PRIMA FACIE TORT AND SUCCESSOR LIABILLTY

49.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth at length herein.

50.   That each of the steps herein outlined below, was taken for the sole and express purpose of defrauding the Plaintiff and depriving it of its contractual rights of conversion and indeed the defendants have boldly announced to the public that the purpose of the machinations described below was to rid themselves of the Plaintiff's ability to convert debt into stock.

51.   That as described above on or about December 15, 2017 Rich Cigars Inc. a Florida corporation with its address for business at 3001 North Rocky Point East, Suite 200, Tampa, Florida 33067, a Securities and Exchange Commission File No.: 333-199452, and an Internal Revenue Service Employer Identification Number of 46-3289369 changed its state of incorporation from Florida to Colorado and changed its name from Rich Cigars Inc. to Intercontinental Technology Inc.

52.   The documents filed with the Securities and Exchange Commission reflected that there was no change in the business management, location, assets, liabilities, net worth or accounting practices of Rich Cigars Inc. thence known as Intercontinental Technologies Inc.

53.   That at this time, Svorai became the majority or controlling shareholder of Rich Cigars Inc. thence known as Intercontinental Inc. and assumed de facto control of the Corporate Defendant.

13

54.     That on December 26, 2017 Intercontinental Technology Inc. changed its name to RCGR SUB Inc, and completed a corporate reorganization as a holding company reorganization under Delaware law whereby RCGR SUB Inc. became a direct wholly owned subsidiary of a newly formed Delaware corporation, also known as Intercontinental Technology Inc., which became the holding company for RCGR SUB Inc. which had been known as Intercontinental Technology Inc. for ten days and before that was known as Rich Cigar Inc. i.e., the Corporate Defendant.

55.     That just prior to the reorganization, yet another company, Intercontinental Services Inc., yet another newly formed Delaware corporation, formed to be a wholly owned subsidiary of Rich Cigar Inc. merged into Rich Cigar Inc., thence known as Intercontinental Technology Inc. and thence known as RCGR SUB Inc. so that Intercontinental Services Inc. no longer existed.

56.     That pursuant to the plan of merger, all of the outstanding shares of common stock and preferred stock of Rich Cigars Inc. thence known as Intercontinental Technology, Inc. were automatically converted into identical shares of stock of the newly formed Intercontinental Technology Inc. so that the shareholders of the original Rich Cigars Inc. would end up with identical shares in the newly formed holding company. That significantly, the Defendants have taken the position in the press, in the media and in filings with the Securities and Exchange Commission that the stock of Intercontinental Technology, Inc. is the stock of Rich Cigars Inc. and that therefore no registration statement is required for the trading of such stock.

57.     However, there was one important exception to this rule and this was that stock held or issued in associated with a convertible financial instrument in Rich Cigars Inc. thence known as Intercontinental Technology, Inc. and thence known as RCGR SUB Inc. would not be converted automatically into stock of the International Technology Inc. Holding Company.

14

Instead, the convertible rights and stock of the Plaintiff would pertain only to RCGR SUB Inc. This would have the effect (and did have the effect as intended) of rendering these all important contractual rights of conversion valueless because RCGR SUB Inc., as a result of these machinations was no longer a publicly traded company but instead was a wholly owned subsidiary of the newly formed Delaware corporation Intercontinental Technology, Inc.

58.     That as a result, when the Plaintiff attempted to convert debt into stock on December 22, 2017 the transfer agent was blocked by the defendants and their attorneys, to wit, Randall Goulding, Esq. who took the position that there was no stock to be obtained as Rich Cigar Inc./Intercontinental Technology, Inc./RCGR SUB Inc. was no longer a publicly traded company and the plaintiff's contractual rights of conversion no longer existed.

59.     That the defendants acted with malevolence towards the Plaintiff because they purposely did not want the Plaintiff to capitalize on the sudden rise in the value and trading price of the shares of Rich Cigars Inc./Intercontinental Technology, Inc./RCGR SUB, Inc.

60.     That incredibly and despite the position of the defendants and their attorneys, the newly formed Delaware corporation now known as Intercontinental Technology, Inc. had an address of 3001 North Rocky Point East, Suite 200, Tampa, FL, a Securities and Exchange Commission File Number: 333-199452 and an IRS Employer Identification Number of 46-3289369 - - the same numbers, address and information as Rich Cigars Inc./Intercontinental Technology, Inc./RCGR SUB Inc., i.e., the Corporate Defendant.

61.     That subsequently, on December 27, 2017 one day after receiving objections from Plaintiff's counsel to the defendants' conduct they changed the corporate name, and in an apparent further attempt to make it appear that the Delaware holding corporation Intercontinental Technology, Inc. could evade the contractual liabilities to which it should be liable, it changed its name again to First Intercontinental Technology, Inc.

15

62. That under these circumstances, the contractual liabilities of the Corporate Defendant should be declared to be binding upon all of its successors upon the grounds that there was an expressed or implied assumptions of these liabilities; that there is a deemed merger between the entities involved, that Intercontinental Technology, Inc., the Delaware holding company now known as First Intercontinental Technology, Inc. is a mere continuation of Rich Cigars Inc./Intercontinental Technology, Inc./RCGR SUB Inc.; and the transfer of the corporate defendant from Florida to Colorado to Delaware and the corporate machinations involved were totally fraudulent and made in bad faith.

63. That by reason of the foregoing, the Plaintiff demands and is entitled to a judgment declaring that the Delaware holding corporation Intercontinental Technology, Inc. and most recently known as First Intercontinental Technology, Inc. is a successor in interest to Rich Cigar Inc./Intercontinental Technology, Inc./RCGR SUB Inc., that its stock now publicly traded under the original trading symbol of Rich Cigar Inc. is subject to the Plaintiff's conversion rights,, directing that holding company to honor those conversion rights and imposing contractual lost profits and damages in excess of $1,000,000 on that holding company.

## AS AND FOR A SEVENTH CAUSE OF ACTION – INJUNCTIVE AND EQUITABLE RELIEF

64. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 63 of this Complaint with the same force and effect as if fully set forth at length herein.

65. That the total amount of principal due to Plaintiff is $116,090.00 exclusive of any additional liquidated damages, consequential damages, default interest, statutory prejudgment interest, legal fees, court costs and litigation expenses, and the Plaintiff is actually entitled to damages in excess of $1,000,000 based upon the lost profits that it has been deprived of by the defendants' actions.

66.     That while Plaintiff is clearly entitled to a money judgment, the Corporate Defendant is clearly incapable of satisfying any such judgment obtained.

67.     That in recent filings required under the Federal Securities Laws the Corporate Defendant represented to the Securities and Exchange Commission and potential investors that its debts and liabilities exceed its assets, such that it must be considered to be insolvent.

68.     That the Corporate Defendant also represented therein that it was operating at a loss, and that it would therefore be unable to pay its debts, thereby also demonstrating that the Corporate Defendant is insolvent, and that any judgment rendered against the Corporate Defendant will almost certainly be uncollectable.

69.     That the only viable avenue available to Plaintiff to obtain repayment of the outstanding Notes is by exercising its conversion rights and thereby obtaining unrestricted shares of stock in the Corporate Defendant and/or its successor in interest, the Delaware holding company known as Intercontinental Technology, Inc. and most recently known as First Intercontinental Technology, Inc. and selling those shares on the open market.

70.     That at present there is an active market for the holding company's stock, which is trading on the open market in significant volume under the trading symbol of Rich Cigars Inc.

71.     That so long as that activity continues and assuming that Plaintiff's conversion rights are not frustrated or impeded, Plaintiff will be able to obtain the unrestricted shares, sell them in the market place, and recover the outstanding principal indebtedness owed to it as well as anticipated profits.

72.     That the market for the shares of stock in the Corporate Defendant and/or its successor in interest is extremely volatile, such that there can be no assurance that the current level of activity will continue to be sustained.

73.     That if as and when such trading subsides or is curtailed, any shares obtained by Plaintiff may at that time no longer be saleable thereby preventing Plaintiff from recovering the indebtedness due it, thereby leading to irreparable harm based on unrecoverable judgments.

74.     That time is of the essence, and to prevent Plaintiff from suffering such irreparable harm, Plaintiff must immediately be permitted to exercise its conversion rights, and the Defendants must be immediately directed to cooperate with the same and to deliver the shares of stock at issue.

75.     That because of the nature, condition, and value of the stock which Plaintiff seeks to acquire in this action is unique to it under the facts and circumstances presented, and because Plaintiff will suffer and sustain irreparable damage that cannot be recovered through a money judgment against the Defendants, Plaintiff has no adequate remedy at law and is entitled to equitable relief.

76.     That by virtue of the foregoing, Plaintiff is entitled to and demands a judgment directing the Defendants to cause additional and sufficient shares of stock in the Corporate Defendant to be issued, so that such shares may be the subject of successful conversions, both as to the March 2015 conversion that remains incomplete as well as all further and future conversions, and therefore the Corporate Defendant and the Individual Defendants must be caused and ordered to execute and deliver all documents necessary to complete the conversion process and to deliver the stock sought by Plaintiff and to which it is contractually entitled in the form of a mandatory injunction.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

77.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 76 of this Complaint with the same force and effect as if fully set forth at length herein.

78.     That because the actions of the defendants having been taken in concert and for an improper purpose are repeated and ongoing and because their misconduct and misrepresentations effect the public at large and those persons who invest in small cap publicly traded companies and because the defendants actions are so wanton, so blatant and so egregious that punitive damages of $2,000,000 should be imposed upon the defendants jointly and severally in order to deter similar misconduct in the future.

79.     That by reason of the foregoing, Plaintiff is entitled to a judgment in an amount to be determined by the Court, but no less than $2,000,000.

WHEREFORE, PLAINTIFF   demands judgment against Defendants as follows:

(i)      For $116,090.00 on the First Cause of Action;

(ii)     For an amount of lost profits to be determined by the Court but in no event less than $1,000,000 on the Second Cause of Action;

(iii)    Awarding Plaintiff its reasonable legal fees and costs of litigation on the Third Cause of Action;

(iv)    For an award of consequential damages in an amount to be determined by the Court but no less than $116,090.00 on the Fourth Cause of Action;

(v)     For an award of consequential damages in an amount to be determined by the Court but no less than $1,000,000 on the Fifth Cause of Action;

(vi)    For a judicial declaration declaring that the Delaware corporation known as Intercontinental Technology, Inc. and most recently known as First Intercontinental Technology, Inc. is a successor to the Corporate Defendant and is bound by the provisions of the Agreements to be sought to be enforced herein and is liable for at least $1,000,000 in damages and subject to court direction to permit

the plaintiff to convert debt into its stock as per the Agreements on the Sixth Cause of Action;

(vii)   For a temporary restraining order and a preliminary and permanent injunction against the Defendants directing that said Defendants and their agents, servants and employees immediately take all steps necessary and proper to permit the conversion of debt to stock and to deliver the stock at issue as described above on the Seventh Cause of Action;

(viii)   For an award of damages in an amount to be determined by the Court, but no less than $2,000,000 on the Eighth Cause of Action; and

(ix)   Together with the costs and disbursements of this action, interest at the rate of default as set forth in the Note; pre-judgment interest as provided by statute, and such other and further relief as the Court may deem just and proper.

Dated: Great Neck, New York
          January 2, 2018

NAIDICH WURMAN LLP

By:

Richard S. Naidich, Esq. (RSN 4102)
111 Great Neck Road, Suite 214
Great Neck, NY 11021
Telephone:     516-498-2900
Facsimile:      516-466-3555
Attorneys for Plaintiff – Power Up Lending Group, Ltd.

Exhibit A




30% PCW    100% Recycled

# NAIDICH WURMAN LLP
## *Attorneys at Law*

111 Great Neck Road, Suite 214
Great Neck, New York 11021

Telephone (516) 498-2900
Facsimile (516) 466-3555

Richard S. Naidich
Kenneth H. Wurman

Bernard S. Feldman
Robert P. Johnson
Of Counsel

December 27, 2017

**VIA FEDERAL EXPRESS AND**
**Email: randy@securitiescounselors.net**
Securities Counselors, Inc.
1333 Sprucewood
Deerfield, IL 60015

Attention:  Randall S. Goulding, Esq.

Re:    PowerUp Lending Group, Ltd. with Rich Cigars Inc.,
       RCGR SUB, Inc., Intercontinental Services, Inc., and
       Intercontinental Technology, Inc., as Successors in Interest

Dear Mr. Goulding:

Please be advised that this office represents PowerUp Lending Group, Ltd., a Virginia corporation ("PowerUp") the holder of two Convertible Promissory Notes ("Notes") and Securities Purchase Agreements ("SPA's") issued by Rich Cigars Inc. (the "Company") dated as follows: (1) a Note dated May 30, 2017 in the initial principal amount of $38,000.00 (said principal having been reduced by a series of conversions aggregating $7,955.00) having a remaining outstanding pre-default principal balance of $30,045.00; and (2) a Note dated September 27, 2017 in the initial pre-default principal amount of $28,000.00.

These Notes contain a material provision which permits the holder of these Notes to exercise its conversion rights and to convert the debt in whole or in part to equity (shares of common stock in the Company) at the sole discretion of the holder pursuant to the provisions of Rule 144.

We have been advised that the Company (which was publicly traded under the symbol RCGR) redomiciled from Florida to Colorado on December 15, 2017 and was renamed Intercontinental Technology, Inc. and retained the Identical Commission File Number and IRS Identification Number and trading symbol that existed prior to its redomicile and name change.

On December 26, 2017, the Company which was known for ten (10) days as Intercontinental Technology, Inc. redomiciled once again from Colorado to Delaware and was renamed as RCGR SUB, Inc. which became a direct wholly owned subsidiary of a newly formed Delaware public corporation also known as Intercontinental Technology, Inc. (which coincidentally was the identical name first assumed by the Company on December 15, 2017) retaining the Company's Commission File Number and IRS Employer Identification Number and trading symbol. Simultaneously RCGR SUB, Inc. now became a privately held subsidiary of newly formed Intercontinental Technology, Inc., a public company.

This office has reviewed the various form 8-K's filed by the Company and its Successor in Interest and of particular interest was the report dated December 26, 2017 which contained as exhibits a copy of the Agreement and Plan of Merger, the Certificate of Incorporation filed with the State of Delaware on behalf of Intercontinental Services, Inc., the Certificate of Incorporation filed with the State of Delaware on behalf of Intercontinental Technology, Inc., the Certificate of Incorporation of RCGR SUB, Inc., the Certificate of Conversion from a non-Delaware corporation to a Delaware corporation, and the Certificate of Merger.

It is interesting to note that the Agreement and Plan of Merger denominated as Article 2, Section 2.1(a) states in pertinent part,

> …"Each outstanding right to acquire Predecessor Stock, such as a warrant or an employee stock option, which is fully accrued, matured and without condition precedent (a conversion right in a convertible financial instrument is not defined herein to include such a "right to acquire"), immediately prior to the Effective Time shall be converted into a right to acquire Intercontinental Technology, Inc. Stock on the same terms and conditions as the right to acquire Predecessor Stock being converted in the Merger, <u>to the exclusion of any rights or obligations that may be associated with a convertible financial instrument,</u> which such rights shall remain, intact, with respect to the Predecessor, and the Predecessor shall remain obligated in all respects thereto, including with regard to rights of conversion with respect thereto" (emphasis added).

While this merger is self-style as being in accordance with Section 251(g) of the DGCL (Delaware General Corporation Law) we believe that this procedure is nothing more than a ruse and is uniquely calculated to interfere with, impede, prevent, and dissolve the conversion rights of our client as contained in the Notes and the companion SPA's. This statute while it has a legitimate purpose, has been misused in this circumstance since it targets specifically the conversion rights of our client. This statute has been properly utilized in the past when dealing with substantial public companies where Registration Statements have been filed and not used to directly interfere with the specific rights of a particular creditor and those similarly situated. This constitutes a form of selective enforcement and is not compliant with the legislative intent of this statute. We note with interest that this merger and domicile change has not yet been approved by FINRA.

The Company is a small cap company and the utilization of the conversion process serves to afford the Company an opportunity to obtain capital which would not necessarily be available to it from institutional investors. The primary method of repayment of these Notes is by the utilization of the conversion process. Had the conversion process not been an integral element of the Notes and SPA's, PowerUp would never have invested in the Company.

It appears that a collective plan or scheme has been promulgated and implemented by a series of individuals including but not limited to, Randall S. Goulding, counsel to the Company and Richard Davis, CEO and President of the Company, and Dror Svorai, a willing participant and cohort to intentionally interfere with PowerUp's contractual rights with the Company. This office has been instructed to investigate the activities of the various entities and individuals involved in this elaborate scheme and to consider the commencement of an action which will contain various causes of action including but not limited to, the violation of the RICO Act.

By engaging in this merger particularly for the not so thinly veiled purpose intended, such action constitutes an event of default under the Notes. By virtue of that default the Company and its successors are now indebted to my client in the sum of $87,067.50 together with accrued and unpaid interest. In order to avoid the commencement of litigation, we suggest that you confer with your client and the individuals involved and contact this office in an attempt to arrive at a mutually agreeable resolution. Your failure to promptly respond will only result in PowerUp considering all of its alternatives including litigation.

Please be guided accordingly.

Very truly yours,

Bernard S. Feldman
Of Counsel

BSF/amp

Exhibit B



**CZARNIK & ASSOCIATES**
245 Park Avenue
39th Floor
New York, New York 10167

**Stephen J. Czarnik, Esq.**
tel. (212) 961-7950
fax.(212) 658-9915
sczarnik@czarnikco.com

January 2, 2018

VIA Email: wallstreetconnection@gmail.com

RICH CIGARS, INC.
3001 North Rocky Point East, Suite 200
Tampa, FL 33607
Attn: Richard Davis, Chief Executive Officer

            **RE:     Power Up Lending Group Ltd. – Convertible Promissory Note**

Mr. Davis:

As you are aware, I am special counsel to Power Up Lending Group Ltd. ("PowerUp").  Your firm, RICH CIGARS, INC. (the "Company"), is the maker of two (2) Convertible Promissory Notes, dated, respectively, May 30, 2017 ("May Note") and September 27, 2017 ("September Note" and together with the May Note, collectively, the "Note(s)"), in favor of PowerUp wherein pursuant to the Notes, PowerUp loaned to the Company Sixty Six Thousand Dollars (66,000.00) in the aggregate; and, after certain conversions of the May Note, a remaining outstanding principal balance of $56,045.00.  In connection with the transactions contemplated by each Note, the Company also executed other documents including but not limited a Securities Purchase Agreement, Share Reverse Letter and Officers Certificate.

On December 22, 2017, PowerUp executed a notice of conversion (the "Notice") pursuant to the May Note whereby PowerUp elected to convert $2,340 of the outstanding principal balance of the May Note into 156,000 shares of common stock of the Company (the "Shares").  The Notice was delivered to the Company and Clear Trust LLC, the Company's transfer agent, on December 22, 2017 together with a legal opinion with respect to the issuance of the Shares. We have been advised that officers of the Company directed Clear Trust LLC not to issue the Shares pursuant to the Notice.

Section 3.2 of each of the Notes provides the following as an Event of Default (as such term is defined in the Note):

        "3.2     Conversion and the Shares.  The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to

*RICH CIGARS, INC.*
*January 2, 2018*
*Page 2 of 3*

transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder."

Furthermore, we have been advised that the Company (which was publicly traded under the symbol RCGR) redomiciled from Florida to Colorado on December 15, 2017 and was renamed Intercontinental Technology, Inc. On December 26, 2017, the Company which was known for ten (10) days as Intercontinental Technology, Inc. redomiciled once again from Colorado to Delaware and was renamed as RCGR SUB, Inc. which then merged into a newly formed Delaware public corporation also known as Intercontinental Technology, Inc. (which coincidentally was the identical name first assumed by the Company on December 15, 2017).

Section 1.6(a) of each of the Notes provides as follows (*emphasis added*):

"Effect of Merger, Consolidation, Etc. *At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III).* "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization."

*RICH CIGARS, INC.*
*January 2, 2018*
*Page 3 of 3*

Each of the Notes further provide in Article III:

". . . Upon the occurrence of any Event of Default specified in Section 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein).  UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence of any Event of Default, other than Section 3.2, exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum in accordance with Article I, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of a breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date), multiplied by (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within one (1) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long and to the extent that there are sufficient authorized shares, to require the Borrower, upon written notice, to convert the Default Amount into shares of Common Stock of the Borrower pursuant to Section 1.1 hereof."

*RICH CIGARS, INC.*
*January 2, 2018*
*Page 4 of 3*

Based upon the foregoing, the Company is now in default under each of the Notes.  Demand is hereby made for the immediate payment (as provided in each of the Notes) of a sum representing 200% of the remaining outstanding principal balances (in the aggregate, 56,045.00 * 2.0 = 116,090.00), together with accrued interest and Default Interest as provided for in the Notes.

We look forward to your immediate response.  Your failure to comply with the demand of this letter will result in PowerUp, exercising all of its rights and remedies available to it at law or in equity.

Regards,

cc:      Mr. Curt Kramer
         Chief Executive Officer
         Power Up Lending Group Ltd.

         Mr. Seth Kramer
         President
         Power Up Lending Group Ltd.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK            Civil Action No.:

POWER UP LENDING GROUP, LTD.,

                              Plaintiff,

          -against-

RCGR SUB, INC. , A DELAWARE
CORPORATION F/K/A INTERCONTINENTAL
TECHNOLOGY, INC., A COLORADO
CORPORATION, F/K/A RICH CIGARS, INC.,
A FLORIDA CORPORATION, RICHARD DAVIS,
DROR SVORAI, AND FIRST
INTERCONTINENTAL TECHNOLOGY, INC. ,
A DELAWARE CORPORATION F/K/A
INTERCONTINENTAL TECHNOLOGY, INC.,

                              Defendants.

## SUMMONS AND COMPLAINT

**NAIDICH WURMAN LLP**
**ATTORNEYS FOR PLAINTIFF**
**111 GREAT NECK ROAD - SUITE 214**
**GREAT NECK, NEW YORK 11021**
**(516) 498-2900**

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of
New York State, certifies that, upon information and belief and reasonable inquiry, the contentions
contained in the annexed document are not frivolous.

DATED:  January 3, 2018                    Signature: _____
                                           Print:  Richard S. Naidich, Esq.

Service of a copy of the within                    is hereby admitted.
Dated:                                             _____
                                                   Attorney(s) for

PLEASE TAKE NOTICE

NOTICE          that the within is a (certified) true copy of an Order entered
OF ENTRY        in the office of the clerk of the within named Court on          , 20_____ .

NOTICE OF       that an Order of which the within is a true copy will be presented for
SETTLEMENT      settlement to the Hon.                    , one of the judges of
                within named Court, at                on          , 20_____ at
                a.m.

DATED: Great Neck, New York
      January 3, 2018                  NAIDICH WURMAN LLP
                                       Attorneys for Plaintiff
                                       111 Great Neck Road - Suite 214
                                       Great Neck, New York 11021
                                       (516) 498-2900